Final case for argument this morning is 14-3097 Washburn v. DVA. Washburn v. DVA. May it please the court. My name is Colin Walsh and I represent Dr. Washburn in this appeal. The MSPB decision should be reversed for one reason. Dr. Washburn was not given a meaningful opportunity to improve her performance because she was held to a different higher standard during her performance improvement plan. Isn't by definition, I mean I used to be in the government a long time ago, I mean you have a performance improvement plan, by definition you're supposed to be treated differently. I mean the point is you're supposed to be supervised and given feedback. It's an opportunity for you to improve. That's the point, right? And therefore the fact that you might be treated somewhat differently with greater care or whatever, that's what's required in a performance improvement plan, is it not? Well, yes, Your Honor, that is correct. A performance improvement plan, the whole point is to improve performance. But that doesn't mean changing the standard under which your performance is judged. And that's what happened here. You have to be given a meaningful opportunity. And the statute requires an opportunity to improve. This is 5 U.S.C. 4302. The regulations require a reasonable change. So tell us precisely what standard existed and what changed. What was the new standard? Well, so there's three things that happened. First of all, and these are all undisputed facts agreed to by the agency, in fact in their own briefing to this court. But Larry Ross, her supervisor, looked at her work more harshly than he did before the PIP and more harshly than he did other employees. In fact, he even testified under oath at the hearing, I did not review everyone's work to the level that I reviewed Ms. Washburn's. That's on appendix page 9. But that was the point I was trying to make at the outset, which is you use the adjective harshly. But isn't it, I mean, he scrutinized her work during this PIP period more closely than he scrutinized other employees. Isn't that how it's supposed to be? That a supervisor is supposed to work more closely? I mean, the point of the PIP is to help this employee out, right? To try to make sure that their allegedly substandard performance is elevated. And how, is it not the best way to do that, to have a supervisor stay on top of things more so than he otherwise would? Well, no, because the same performance standards have to be applied both during the PIP and before the PIP. Otherwise, you're changing the rules of the game. You're moving the goals up. That's why I asked you. You said, when I asked you about what was different, you didn't cite me the standard change. So you said, you started to describe, he treated her more harshly and he scrutinized her more closely. To me, that's a different question. Are you saying that a different standard was employed into evaluating her work than with respect to other employees? Perhaps I'm being a little loose when I use standard. What I mean to say is the way her work was reviewed and evaluated changed. So they didn't actually change the standard. The standard was do good work. They didn't change the standard to do better work during the PIP. What they did, though, was they evaluated her work differently in terms of what good work was. So, for example, Larry Ross, well, so, for example, Dr. Washburn would draft compliance reports. Then she would submit it to a program analyst who would check it in correct grammar, typos, structure, format, make sure the proper template was being used, make sure templated language was being used. It's Ms. Kincaid. Yes, her name, Misty Kincaid in this case. And you can find out all about her duties on appendix pages 11 through 14. And during the PIP, Mr. Ross was reviewing the work that your client otherwise would have passed through Ms. Kincaid, and he was reviewing it directly to try to get a sense what kind of shape was it in when it was being given to Ms. Kincaid. Your Honor is exactly correct. Larry Ross removed that step of review, that normal work process that all the other employees had. Right, but what's wrong with that? And if what he was trying to figure out was the work that Dr. Washburn was giving to the editor, the reviewer, too far off the mark, leaving too much for the editor, reviewer to do, he had to look at it directly, right? Well, if that's the contention, then I could see why he would want to do that, but that's not the standard that the other employees are held to. He actually doesn't know whether or not her work was submitted with too many errors or whether any other employee's work was submitted worse than Dr. Washburn's. And that's because it all passes through Ms. Kincaid. And in fact, Mr. Ross under oath acknowledged that he was looking for these errors, these errors that he would not have seen prior to the PIP. And because he put her on the PIP, he stated, I would say, a significant portion, if not all of those formatting errors, would not have made it to me. And that is the reason, that is the very reason that I asked to see that, to see Ms. Washburn's work before it had a chance to be edited. I want to just echo what Judge Serrato said. I mean, what's wrong with that? You have an employee who you're trying to assess, this person, should she be removed or not? I mean, should there be some other kind of progressive discipline? And you know that typically you would get her work having passed through this editorial function. And one of the things you're trying to figure out is how motivated is this person to improve her performance? So how do you know that? I mean, isn't looking at the raw material one way to make that assessment? It might be one way to make that assessment, but it's not allowed to be used against that employee. It's changing the rules. It's moving the goalposts. It's here before the PIP. Let me just engage with you about that. So your client knows that she's been criticized for doing substandard work and making a lot of errors that shouldn't have been made. And she knows that she's under a performance improvement plan, so she knows she's going to get additional scrutiny because of that. She knows that. So what's the surprise with her getting additional scrutiny? Why is that unfair? It's not fair because it's looking at different mistakes. So before her performance was a problem, or before they said her performance was a problem, all of these mistakes may have existed. She may have made them. We don't know because he didn't look at it. And he didn't look at it for anybody else. He's trying to assess how motivated she is, how seriously she's taking the discipline, how likely she is to improve her performance. So if he looks at the raw material and it's improving, that's to her credit. And if he looks at it and it's full of basic mistakes that should have been caught by spellcheck, that's not to her credit. So how is that unfair as a matter of employee management? Because it changes the rules. It moves the goalposts. It puts a different standard. So before the PIP, she didn't have to worry about whether or not there were typos, whether or not grammar was completely correct because Misty would look at that. What deficiencies led to the PIP? What deficiencies? Yeah. It had to do with errors found, I believe, on a CBOC report and several other compliance reports. And not just wording errors or at that stage. I gather there were, roughly speaking, two kinds of errors. Inaccuracies. Patients were included that shouldn't have been or vice versa. And then there were writing errors. Were both part of what led to the initiation of the PIP? Or did both occur during the review, during the PIP process? Or how do you separate those things? Well, I believe the agency would argue that all of those things led to the PIP and all of those things continued during the PIP. But, again, you can't change the rules. So you can't change how work is evaluated. And the MSPB has repeatedly held that the opportunity to improve must be a meaningful opportunity and it is one of the most important substantive rights a federal employee has. It's also a fundamental substantive importance. This court has recognized that as well in its cases reviewing MSPB decisions. The other thing that they did, showing that this was not a meaningful opportunity for Dr. Walshburn, was they created a secret negative file of her work. While she's on this PIP, while she's going through trying to perform it, they're writing negative reports of contact and secretly putting them in her file. For a moment, take out the word secret and take out the word negative. Is there anything unexpected about the reviewer during the PIP process making a record of each contact? And let's assume now that Mr. Ross was seeing it absolutely straight and fair and they were negative because there was reason to be negative. And then the next question, I suppose, is was he obliged to be publicizing or sharing with her his record of each of those contacts? I'm trying to separate out what's nefarious, if anything, about the secret negative reports of contact. Well, so what's nefarious about it is that Dr. Walshburn wasn't allowed to see them, didn't know they were happening, not allowed to reply to them, and not allowed to rebut them in any way. So what would happen is Dr. Walshburn would walk... In the MSPB proceedings, was she allowed to examine those and contest them? Well, yes, but only after she was removed. But didn't she get a proposed removal that she could respond to? So she had that level of proof, right? Yeah, but the proposed removal came at the end of the performance improvement plan.  to whatever negative assessment arose from the PIP at the agency level, and then again before the MSPB, as Judge Toronto pointed out. Am I right about that? Yes, she did have a chance to respond to the proposed removal, and she did challenge it to the MSPB as well. But that doesn't fix the fact that during the PIP, when she's supposed to be given this opportunity to improve her performance, he's secretly documenting all of these conversations, putting them in her file, and then using them later in the proposed removal. Wait, you say documented these conversations. What conversations? You mean conversations between Mr. Ross and Ms. Washburn? Yes. Well, so she knew they were, if the two of them were on a conversation, they both knew what was happening, right? The fact that he wrote down something, she knew about the conversation, or she was a party to it, right? Well, yes, but at the same time, he characterized it the way he characterized it, didn't tell anybody that he was doing it, and then used it against her. This is a secret negative file, and the MSPB has actually found that this denies an employee the opportunity, the meaningful opportunity to improve performance. I don't understand, but you're saying he told, you're saying what he wrote down was what he told her. So if you're the employee and I'm the supervisor, and I tell you you're doing X, Y, and Z wrong, and I'd like you to do the following by tomorrow, and then I go back to my office and I write down, I just told this employee to do X, Y, and Z, and I'll document it tomorrow. Is that what we're talking about here? And what's secret about that? You know what I've told you, and I know what I've told you. What's the secret? Well, the secret is that that's not exactly what happened in this particular case. What would happen is Dr. Washburn would ask questions, would talk to Mr. Ross, ask about leave, ask about requesting a transfer, and Mr. Ross would go then and write down, Dr. Washburn has a fundamental misunderstanding of these processes. She asked me this question. I can't believe she asked me this question. These reports of contact all characterize these and are used against her later to show that her performance was not important. And what, in your view, would have been necessary, that he would have, when he had this reaction to what she was saying, he would have confronted her at the time and said, I can't believe you're asking me this question? What would have made this non-secret? Well, what would have made it non-secret would be that very thing, making it not secret, not writing down your own characterization of a conversation, putting it in the employee's file, and then later using it to say, oh, you didn't improve your performance, or here you have a fundamental misunderstanding of this process. And then during the performance improvement plan, she asked, her performance is supposed to be improved. The regulations require a supervisor to assist with that. And so if he is unwilling to do that, or if he is assisting in saying, oh, but the fact that she asked this is terrible, that's not giving her a meaningful opportunity. That shows that they have decided that she's going to be removed and that they are building up a case. And that's exactly what the MSPB found in Zhang v. Defense of Investigative Service, where they said, on the basis of the supervisor's testimony, the frequency and tenor of his confidential memoranda to the personnel file regarding the appellant's performance and the nature of his counseling sessions with her, the appellant in this case was, in fact, not given a fair and meaningful opportunity to improve her performance. But that sounds like a very fact-specific type of analysis. I mean, it's quite possible that someone simply legitimately had a negative reaction to what an employee was saying or asking. And he or she is entitled to that reaction, are they not? Yes. I guess I don't quite understand your question here. No, my question is, sure. I mean, I can imagine a case where you can look at the notes to the file and it becomes clear that the person had a preexisting bias or wasn't at least a bit interested in anything positive that the employee had to say. That would be problematic. But you could also look at negative comments and say this is just the honest assessment that the supervisor is giving. So it's a fact-specific inquiry. The problem isn't that the supervisor made notes or that the notes were negative. It's if there's a pattern of notes, negative notes, that suggest that there was never any thought that the employee might improve or that there was something biased about the process.  You'd have to look at the content of the notes and make an assessment whether the person simply never had a chance. Well, yes. Your Honor is correct. These notes were negative and they show that they did not, that Larry Ross did not think she was going to improve. That's why, that's the whole point of him taking this inquiry. Maybe that was reasonable. Don't you need to look at the entire fact situation to see whether that is a reasonable conclusion or not? Yes. I suppose you do. But the fact is that he didn't give anybody the opportunity to fix these problems that he was secretly noting in the performance form. Why don't we hear from the government and we'll restore a few minutes. Thank you, Your Honor. May it please the Court. Substantial evidence supports the agency's decision to remove Ms. Washburn because she could not perform critical functions of her job after being given a reasonable opportunity to improve. Can you address the first point your friend made, which was if someone else was doing the first level of editing and review for just commas and typos, how would that have been part of her requirements of her job if that wasn't her job? If all other people were getting this level of review and she was otherwise getting it if she went back to her other job, her job that she would retain? Well, Your Honor, this would be a question of whether there was an improper change or impermissible change in her performance standards. And here, both Mr. Ross wanted to look at whether she was actually submitting work that in accordance with the performance standards required only minor revisions. And substantial evidence supports that this was reasonable in light of the fact that it was not in Ms. Kincaid's job description that she would catch these types of errors, nor was it in Ms. Washburn's description of performance standards that there would be someone to take this first cut. But were all other employees subject to this in terms of Ms. Kincaid, in terms of the initial review? Well, Your Honor, yes, Your Honor, she did take a first cut at these types of written products. But I think it's important to note that a substantial portion of the proposed removal and the reasons why Ms. Washburn was removed, and this is at 150 through 153 of the appendix, was not due to the fact that she was making grammar errors. It was due to the fact that there were substantial substantive errors in her work. For example, on page 150 of the joint appendix, Mr. Ross noted that she wasn't properly populating the databases, she wasn't including or excluding a proper patient population. And doing that changes the analysis. For example, if you're analyzing inpatient versus outpatient, you only want to look at, for this type of review, the care that inpatients received, and that she wasn't accurately recording that information. And then she wasn't, therefore, with diabetes and heart failure patients, adequately assessing the types of care these patients received. And as we explained, these are Office of the Inspector General reports that do affect how veterans receive care. For example, if the VA makes an incorrect finding, then the organization will divert resources towards solving a problem that may not, in fact, be there. Likewise, with the Alexandria Community Assessment Program report, she made an incorrect finding regarding biopsy notifications. Also, although opposing counsel testified that Ms. Kincaid would correct templates, she, in fact, testified at 1137 of the joint appendix that she did not correct the template. And the templates are important because someone in Ms. Washburn's position is expected to use certain types of negotiated language with these providers, to make sure they're communicating on the same page. And so she was making, even if you assume that there may have been more or less grammatical errors had Ms. Kincaid not made this cut, there certainly were a large number of substantive errors in her work that would justify her removal. As a procedural matter, if that's the right term, can the removal be sustained only on the basis of the kinds of substantive errors you just described? Yes, Your Honor. Without any reliance on writing deficiencies? Well, there were writing deficiencies. The fact is that she would go through these databases and make incorrect findings. That would lead to substantive errors in her written product. Right, and maybe I haven't made myself clear. Writing errors include typos, bad usage, bad grammar, bad punctuation, the kinds of things that people make all the time get corrected. Some of the talk in this case is about that kind of problem. There's also talk, of the sort that you just spent a minute reciting, about substantive errors that made the reports either useless to providers because they didn't use the correct language so that they were speaking the same language, or even worse, data problems that can produce incorrect substantive evaluations. My question is whether what I'm going to call substantive errors, and I will include template errors in that, are sufficient to support the Board's support of the removal here, even if we thought that the complaint about the writing errors were not. Yes, Your Honor, I believe so. She was removed based upon her failure to accomplish the performance standards accomplishment of organizational goals and objectives. That was one critical performance standard she failed to meet, and she also failed to meet communication, and I think looking at the performance standard written products are approved by the supervisor with only minor revisions, they're only occasional substantive changes to content, I think she would fail as well on the only occasional substantive changes to content, which is what opposing counsel appears to be addressing in his argument. But was there a finding to that effect either by the agency or the Board or the administrative judge may know that removal was justified even if one disregards Mr. Ross's and Ms. King's dissatisfaction with her writing? Again, by writing I mean to include only the non-substantive points. Your Honor, I believe the administrative judge went through in detail regarding the nature of the errors that she made and found that she had, that she failed to perform both the accomplishment of organizational goals and objectives and the writing. This is at pages 18 through 20. Right, but a decision that says I'm firing you because it's a combination of problem A and problem B is not a decision that I would fire you even if I found no more than problem A. Well, I think, Your Honor, I don't have a precise page site for Your Honor, but I believe that saying substantial evidence supports the agency's removal. Certainly, there was discussion about all of the errors that she made. Certainly, the administrative judge discussed the fact that she had made these errors in the databases. I don't know that he made it affirmatively as an alternative holding. But he talked about, I mean, at least at page 22 of the administrative judge's decision, he talked about the fact that he routinely emphasized the importance of using the proper template. He talked about problems with the health care records. So, I don't know that he affirmatively said one way or the other, but I believe the administrative judge did discuss the fact that she had multiple errors and that substantial evidence, substantial probative evidence, this is page 24, supports that her performance is unacceptable for multiple critical elements. So, it wasn't just the basis of the typographical errors. As well, turning to the... MSPB, I believe also this is somewhat changing the fact that she was, I think somewhat, Ms. Washburn's performance has, her questions have changed in terms of what she's challenging for her performance. I believe the nature of what she was challenging before the MSPB was that her standards were not sufficiently clear and she was also challenging the fact that, she was challenging the Ms. Kincaid review, but it didn't get into the detail of what the other, I don't think to the degree the appeal before the board got into the same level of detail regarding the nature of her other errors. With respect to Ms. Washburn's argument that she was not given a reasonable opportunity to perform because the agency somehow improperly changed the standards with respect to a secret negative file, the record in this case demonstrates that Mr. Ross took multiple steps to meet with her on a weekly basis to explain to her, he described it as an interactive process in his testimony before the MSPB, what he was talking to her, that he explained the major errors and the minor errors and the copy of all the supporting documents in the evidence file is at 217-375 of the joint appendix. Now, Mr. Ross also tested, some of the documents in that binder were the reports of contact and as he testified at 885 of the joint appendix, those were documents that he, were a pre-printed form that where he would make a note of the contact and what they discussed. Anything that was a factor in her removal with those reports of contact was included in the evidentiary binder and those frequently, almost exactly tracked the weekly report documents that he and Ms. Washburn worked together after they met on a nearly weekly basis. To the extent there were other documents, there were a few other reports of contact that Ms. Washburn didn't obtain until discovery because they were not factors in her removal, such as the discussion about her being late, those weren't a factor in her removal. So everything that led to her removal, she was given an opportunity to respond to. If the court has no further questions, we respectfully request to uphold the MSPD's decision. Regarding this secret negative file, I think the agency misses the point a little bit. She argued that they didn't use all of these things to remove her, but that's not the problem with the secret negative file. The problem is that it exists, that it was there to be used and was designed to show that she was not going to pass this performance improvement plan. And just to clarify one thing about these templates, Ms. Kincaid did talk about using the correct templates on page 1131 of the joint appendix, where she talked about her duties. And I'm looking at lines roughly 19 through 22. So 1131? 1131. Do you understand what the problem is when JA numbers are printed right over other letters and you can't read them? I have no idea where 1131 is in this document. I'm sorry, Your Honor. I should have used a better bake stamp to create this. I can find it. Really? Yeah, I was going to say it's on 1131, but that doesn't help. The numbers actually stick out past whatever this whole number is. Oh, okay. Yes, I got it. Go ahead. But lines 19 through 22, I read through it to make sure that, you know, there's no grammar mistakes and the structure is correct and that I'm using the correct template, that sort of thing. Wait, whose testimony is this? This is Misty Kincaid. This is the program analyst testifying at the hearing. And then she talks about the templates that Dr. Washburn would use and submit to her for proofreading, for verification. This process was changed. Misty Kincaid was no longer allowed to see Dr. Washburn's work, and the reason Larry Ross did that was so that he could find more mistakes, that he would not otherwise have seen. Well, that's one way of looking at it, but as I was asking you before, it could have been simply a way of seeing if she was taking the PIP seriously. Well, Larry Ross actually testified at the hearing and said, that is the reason, that is the very reason that I asked to see that, to see Ms. Washburn's work before it had a chance to be edited. And that was in response to being asked, well, wouldn't you find more errors that you wouldn't see in other employees? And he said, yes. When asked if he knew about whether other employees committed these same things, he wouldn't know, because it comes through Ms. Kincaid. And he only reviewed their work after that. And the fact that he changed these procedures for the PIP to catch more mistakes that would not otherwise have been a part of her performance standards, means that she was not given a meaningful opportunity to improve, and so her removal must be reversed. I thank all the counsel in the case. And with that, that concludes our testimony today.